**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Food Services of America, Inc., a Delaware Corporation | No. CV-12-00175-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Paul Carrington; et. al. | |
| Defendants. | |

Pending before the Court is Plaintiff's Motion for Partial Summary Judgment, (Doc. 105), and Motion for Sanctions, (Doc. 111), and Defendants' Motion for Summary Judgment, (Doc. 109), and Motion to Strike, (Doc. 134). For the reasons discussed below, Plaintiff's Motion for Partial Summary Judgment is granted in part and denied in part, its Motion for Sanctions is granted in part and denied in part, Defendants' Motion for Summary Judgment is denied, and their Motion to Strike is granted.

## BACKGROUND

This case involves an employer's claims of misappropriation of trade secrets against former employees. Plaintiff Food Services of America ("FSA") is a national distributor that wholesales food products to operators such as restaurants and schools. (Doc. 106-2, Ex. B (Manuszak Decl.) ¶ 14.) Defendant Paul Carrington began his employment with FSA as a Supplier Information Specialist ("SIS") in September 2008. (Doc. 106, PSOF ¶ 2.) Defendant Elba Rubio had previously joined FSA in May 2008 and was also an SIS at the time of her termination. (*Id.* ¶ 3.)

As employees of FSA, Defendants received new hire orientation and materials. (*Id.* ¶¶ 4–5.) Among those materials were an FSA Handbook and Arbitration Agreement that Defendants acknowledged and signed. (*Id.* ¶¶ 5–6, 10–12.) The Parties dispute whether Defendants were also provided with and signed a Confidentiality Agreement. (*Id.* ¶¶ 7–8; Doc. 115, DSOF ¶¶ 7–8.) All three documents included provisions regarding the confidentiality of FSA information and the duty of all FSA employees to keep such information secret. (Doc. 106, PSOF ¶¶ 6, 9, 12.)

Defendants were granted access to FSA information so they could use it as SISs in their dealings with suppliers, customers, and internal personnel. (*Id.* ¶ 13.) That information included the following: (1) manufacturer and UPC codes; (2) vendor, customer, and FSA employee contacts and information; (3) product brands, descriptions, and formulae; (4) product cost, pricing, and rebates; (5) product purchase and sales volume; and (6) FSA business strategies. (*Id.*) FSA information is accessible only through its closed and secure system. (Doc. 106-2, Ex. B (Manuszak Decl.) ¶ 23.) Access is restricted to those who have passes and electronic passwords which are granted to employees who need to use the information to perform their job functions. (*Id.*)

On March 4, 2011, FSA terminated Rubio's employment for gross misconduct. (Doc. 106, PSOF ¶ 14.) Consistent with its policy regarding terminated employees, upon termination, Rubio's access to FSA's system was cancelled. (*Id.* ¶ 15.) As of the close of the business on March 4, Defendants knew that Rubio was no longer authorized to access FSA's system or its information. (*Id.* ¶ 16.) That evening, Defendants agreed to have Carrington forward specific FSA information to his and Rubio's personal e-mail accounts from FSA's system. (*Id.* ¶ 17.)

On March 5, 2011, Carrington went to FSA's offices when he was not scheduled to work, and obtained access to FSA's system. (*Id.* ¶¶ 18–19.) That weekend, Carrington sent approximately 300 e-mail strings to his and Rubio's personal e-mail accounts after Defendants mutually selected which strings to send. (*Id.* ¶ 19.) The e-mails included new item requests and customer product information forms in response to operator/customer

inquiries, new product information sheets from suppliers, distribution plans and freight matrices, and letters to specific customers containing product offers. (Docs. 119-1–6, Ex. O.) On March 7, FSA also terminated Carrington's employment for gross misconduct. (*Id.* ¶ 23.)

FSA sent letters to Defendants on March 8, 2011, demanding the immediate return of electronic or hard copy documents containing FSA information. (Doc. 110, DSOF ¶ 10.) Carrington responded on March 14, stating that he no longer possessed FSA information and had deleted any documents he may have had. (*Id.* ¶ 11.) Rubio did not respond to FSA's letter. (*Id.* ¶ 13.) Upon receipt of the letters, Defendants knew that they both possessed information that FSA sought. (Doc. 106, PSOF ¶¶ 27–28.)

Months later, FSA investigated Carrington's FSA account and discovered the e-mails he had sent with FSA information to personal accounts in March 2011. (Doc. 110, DSOF ¶ 19; Doc. 133, PSOF ¶¶ 19–20.) On January 24, 2012 an NLRB trial based on Carrington's discharge began. FSA's counsel alleged that it first discovered that Carrington still possessed FSA information and had provided false statements in his response to FSA's March 8 letter on that first trial day. (Doc. 110, DSOF ¶ 26.) FSA asserts that Carrington provided a disc during the morning recess of the trial which contained the information and alerted FSA to the deception. (Doc. 133, PSOF ¶ 26.)

FSA brought this action against Defendants the next day on January 25, 2012. (Doc. 1.) The Complaint alleged the following claims: (1) violation of the Computer Fraud and Abuse Act ("CFAA"); (2) violation of the Arizona Uniform Trade Secrets Act ("AUTSA"); (3) violation of the Arizona Anti-Racketeering Statute; (4) breach of fiduciary duty; (5) conversion; and (6) unjust enrichment. On August 7, 2012, Defendants filed a Motion for Judgment on the Pleadings. (Doc. 32.) The Court granted the Motion as to the CFAA claim but denied it as to the remaining claims. (Doc. 57.) Defendants filed another Motion for Judgment on the Pleadings as to counts three through six on December 2, 2012. (Doc. 72.) The Court granted the Motion and found that FSA's common law tort claims were preempted by the AUTSA because they were based on the

1  misappropriation of confidential information and not saved by the anti-abrogation clause
2  of the Arizona Constitution. (Doc. 95.) The Court denied Defendants' Motion for
3  Reconsideration. (Doc. 135.)

4      The Parties now move for summary judgment on FSA's remaining AUTSA claim.
5  (Docs. 105, 109.) FSA further moves for sanctions against Defendants for spoliation of
6  evidence, (Doc. 111), and Defendants move to strike expert declarations filed in support
7  of FSA's Motion, (Doc. 134).

**DISCUSSION**

## I.   LEGAL STANDARD

10      Summary judgment is appropriate if the evidence, viewed in the light most
11  favorable to the nonmoving party, shows "that there is no genuine issue as to any material
12  fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).
13  Substantive law determines which facts are material and "[o]nly disputes over facts that
14  might affect the outcome of the suit under the governing law will properly preclude the
15  entry of summary judgment." In addition, the dispute must be genuine, that is, the
16  evidence must be "such that a reasonable jury could return a verdict for the nonmoving
17  party." *Anderson*, 477 U.S. at 248. "[A] party seeking summary judgment always bears
18  the initial responsibility of informing the district court of the basis for its motion, and
19  identifying those portions of [the record] which it believes demonstrate the absence of a
20  genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

21      Because "[c]redibility determinations, the weighing of the evidence, and the
22  drawing of legitimate inferences from the facts are jury functions, not those of a judge, . .
23  . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be
24  drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H.*
25  *Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th
26  Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the
27  jury.") (internal citations omitted).

28      Further, the party opposing summary judgment "may not rest upon the mere

allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also* LRCiv. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

When parties file cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Fair Housing Council of Riverside County v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir. 2001). In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion. *Id.*

## II.    MISAPPROPRIATION OF TRADE SECRETS

### A.    Existence of Trade Secrets

Arizona has adopted the Uniform Trade Secrets Act, "which codifies the basic principles of common-law trade-secret protection, to govern the resolution of trade-secret issues." *Enter. Leasing Co. of Phoenix v. Ehmke,* 197 Ariz. 144, 148, 3 P.3d 1064, 1068 (Ct. App. 1999). Arizona recognizes the Restatement of Torts in the absence of controlling authority for guidance as to misappropriation claims. *Id.* Under the AUTSA, a plaintiff may recover damages for misappropriation of a trade secret. A.R.S. § 44-401–07. The AUTSA defines "trade secret" as follows:

> (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
>> (a) Derives independent economic value, actual or potential, from

not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 44-401. "The threshold determination whether to protect information as a trade secret therefore depends upon the nature of the information and the circumstances surrounding its secrecy and the maintenance thereof." *Ehmke*, 197 Ariz. at 148 (internal citation omitted). The owner of the information has the burden "to establish that the matter is secret . . . [and] that it exercised reasonable care to safeguard the secret." *Id.* at 150.

### 1.     Independent Economic Value

To be entitled to trade secret protection, FSA's information must derive economic value from the fact that it is not generally known to or readily ascertainable by other persons in the industry. *See id.* at 149 ("Because the hallmark of a trade secret obviously is its secrecy, not only must the subject-matter of the trade secret be secret, it must be of such a nature that it would not occur to persons in the trade or business."). Matters that are public knowledge, such as those available in trade journals or known to principal trade persons, are not safeguarded as trade secrets. *Id*. In particular, "when a process or idea is so common or widely known that it lacks all novelty, uniqueness and originality, it necessarily lacks the element of privacy required to make it legally cognizable as a trade secret." *Id.*

Using an FSA-issued computer, Carrington transmitted FSA information to his and Rubio's personal e-mail accounts in March 2011.[1] (Doc. 106, PSOF ¶¶ 18–19.) The e-mails included internal FSA communications and external FSA communications with operators (FSA's customers) and suppliers (manufacturers from which FSA purchases

---

[1] Defendants also admit sending an undisclosed number of FSA e-mails to their personal accounts in February 2011 but it is not clear from the record whether they contained trade secret information. (*See* Doc. 106, PSOF ¶¶ 32–33.) The vast majority of the e-mails were sent by Carrington in March 2011. (Doc. 115, DSOF ¶¶ 32–33.).

products). Those communications included the following elements of information: manufacturer and UPC codes, brand names and product specifications, product formulae and pricing strategies, rebates, customer contact information, volumes, and pricing, and vendor contact information and data. (Doc. 106, PSOF ¶¶ 13, 30–31.) Defendants contend that some of that information is readily ascertainable; for example, the manufacturer and UPC codes, brand names and product specifications, vendor and customer contact information are generally known to others in the food service industry. FSA argues that even if some of those elements are readily ascertainable, its information is still entitled to protection as compilations of data.

"Although matters of general knowledge cannot be appropriated as secret, a trade secret may consist of a combination of elements even though each individual component may be a matter of common knowledge." *Ehmke*, 197 Ariz. at 150 (citing *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475 (1974)). A trade secret may include a compilation in which the individual elements "are in the public domain but there has been accomplished an effective, successful and valuable integration of those public elements such that the owner derives a competitive advantage from it." *Ehmke,* 197 Ariz. at 149 (internal citation omitted). Thus, the analysis depends on whether the compilation as a whole qualifies as a trade secret. *Id.*

Defendants have submitted under seal the e-mails they transmitted in March 2011. (Docs. 119-1–6, Ex. O.) A number of these e-mails contained new item requests in relation to inquiries from FSA's customers. The e-mails attached customer product information ("CPI") forms. (Docs. 119-1–3, Ex. O ("Exs. A11, A21").) The CPI forms included the name of the customer and contact person(s), the manufacturer, detailed description and quantity/volume of the product, the customer price or distributor cost, and the time period for which this information was active. (*See id.*) Other e-mails attached "new product information sheets" presumably from FSA's suppliers with similar contact information, product detail and pricing per quantity. (Docs. 119-3, Ex. O ("Ex. A23").) One of the e-mails is a memo describing FSA's national distribution plan for selected

products sent to its distribution centers. (*Id.* ("Ex. A21").)  Attached to the memo are spreadsheets containing "freight matrices," for specific products that list distribution centers and their addresses as well as product price and quantity. (*Id.*) The e-mails further included letters to individual FSA customers containing product offers with details as to quantity, price, purchasing period, and shipping. (Docs. 119-4, Ex. O ("Ex. A27").) Also within the e-mails were informal price/quantity quotes for customers with accompanying product images and specifications. (*Id.* ("Ex. A28").)

FSA sets forth a number of facts about the competitive aspects of its industry, none of which have been contested by Defendants.  For example, FSA is a distributor that wholesales various foods and supplies to food service operators, ranging from schools to small restaurant chains. (Doc. 106-2, Ex. B (Manuszak Decl.) ¶ 14.) Competition among distributors for the business of operators is generally on product price. Because the cost of food and supplies represents a large percentage of their total cost, operators may switch distributors based on slight variations in price. (*Id.* ¶ 20) (declaring that operators will change distributors "solely because the difference in the negotiated price of ground beef from different distributors is one cent per pound"). Hence, in order to offer lower prices to operators, it is critical that FSA pays lower prices to product suppliers. (*Id.*) (declaring that "[a] one cent advantage in cost per pound can result in millions of dollars in sales"). Put simply, FSA relies for its competitive advantage on "the products [it] buy[s], who [it] buy[s] them from, who [it] sell[s] them to, what [it] pay[s] for them, and what [it] sell[s] them for." (*Id.* ¶ 25.)

FSA's representatives negotiate prices on all products with operators and suppliers. (*Id.* ¶ 17.) There is no preset price list or publicly available catalogue. (*Id.*) FSA maintains proprietary information on "each customer and their individual needs," product pricing for operators, and "acquisition[] costs" negotiated with suppliers. (*Id.*) In his affidavit submitted in support of FSA's Motion for Summary Judgment, Steve Manuszak, the Senior VP of FSA, states that if this information were disclosed to other distributors, they could use it to make more favorable contracts with operators or

suppliers and push FSA out of business. (*Id.* ¶ 21.) It would reveal FSA's "manner, method and process of doing business." (*Id.* ¶ 25.) Further, such disclosure would be contrary to confidentiality agreements that FSA signs with its partners and would cause those partners to lose trust in FSA. (*Id.* ¶ 22.) Defendants do not contest these facts. The information that Carrington transmitted to himself and Rubio thus contained FSA's confidential compilations of data. Those compilations provide a competitive advantage to FSA in that they allow FSA to uniquely serve its customers and are not known by other distributors in the industry. *See Ehmke*, 197 Ariz. at 148 ("[A] trade secret may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it."). Even if the information obtained by Defendants contained elements of common knowledge, such as product specifications, it is the *combination* of those elements, such as what products each customer requested at what price or what FSA bought from suppliers at what cost that provides economic value to FSA.

Further, FSA created and maintained the information through "substantial efforts . . . such that it would be difficult for a competitor to acquire or duplicate the same information." *Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 302 P.3d 628, 632 (Ct. App. 2013); *Prudential Ins. Co. of Am. v. Pochiro,* 153 Ariz. at 371, 736 P.2d at 1183 (Ct. App. 1987) (stating that a list of customers, "if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money, . . . is in the nature of a trade secret"). Manuszak declares that the compilations "took millions of dollars and years to develop" over the last 25 years and is the product of the "work [of] thousands of employees." (Doc. 106-2, Ex. B (Manuszak Decl.) ¶ 13.) He further states that the mix of customer, supplier, and product information "has been refined over decades to create our successful business offering in a highly competitive industry." (*Id.* ¶ 25.) Thus, the information obtained by Defendants has independent economic value.

- 9 -

Defendants argue that FSA's delay in bringing this suit shows that the information has minimal value to FSA. Defendants acquired the information in March 2011, but FSA did not bring suit until January 2012. That delay, however, does not establish that the information lacks economic value. The undisputed facts show that during that period, FSA approached Defendants to retrieve any information they had acquired and kept after their termination. On March 8, 2011, FSA sent letters to Defendants demanding the immediate return of any hard copy documents containing FSA information and destruction of electronic records with such information. (Doc. 110, DSOF ¶ 10.) Carrington responded on March 14, stating that he did not have confidential FSA information and had deleted any information pertaining to his employment with FSA. (*Id.* ¶ 11.) Rubio did not respond to FSA's letter. (*Id.* ¶ 13.) Some months later[2], FSA investigated Carrington's FSA account and discovered that he had sent information to personal e-mail accounts in February and March 2011. (*Id.* ¶ 19; Doc. 133, PSOF ¶¶ 19–20.) FSA first discovered that Carrington still possessed FSA information when the NLRB trial commenced on January 24, 2012. (Doc. 110, DSOF ¶ 26.) FSA filed this suit the next day on January 25. (Doc. 1.)

FSA did not excessively delay prosecution of its case against Defendants. To the extent it could have investigated Defendants' conduct earlier, any such delay relates to the amount of damages, if any, to which FSA is entitled and not to whether FSA's information has independent economic value.

### 2.      Reasonable Efforts to Maintain Secrecy

"[T]he most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information." *Ehmke*, 197 Ariz. at 150. But the secrecy need not be absolute. *Miller v. Hehlen*, 209 Ariz. 462, 471, 104 P.3d 193, 202 (Ct. App. 2005)

---

[2] The Parties dispute the timing of that analysis and FSA maintains that the analysis was in response to October 2011 letters from the EEOC and NLRB based on administrative charges filed by Carrington against FSA. (Doc. 133, PSOF ¶¶ 20–21.)

(internal citation omitted). The owner of the secret information need only show that it made reasonable efforts to maintain its secrecy to ensure that it would be difficult for others to discover it without using improper means. *Ehmke,* 197 Ariz. at 150 (citing *K-2 Ski Co. v. Head Ski Co.,* 506 F.2d 471, 474 (9th Cir. 1974)). Reasonable efforts do not require extreme and unduly expensive procedures to protect trade secrets against industrial espionage. *Id.*

Further, "the owner of a trade secret does not relinquish its secret by disclosure to employees on a necessary basis or by limited publication for a restricted purpose." *Miller*, 209 Ariz. at 471 (customer list was not trade secret when employer gave it to former employee and did not condition its use); *see Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 302 P.3d 628, 632–33 (Ct. App. 2013) (collecting cases); Restatement (First) of Torts § 757 (1939) ("It is not requisite that only the proprietor of the business know [the trade secret]. He may, without losing his protection, communicate it to employees involved in its use."). Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. Restatement § 757.

FSA took several measures to protect the secrecy of its information. FSA made Defendants and other employees aware that they were to keep FSA information confidential. It is undisputed that Defendants received instructions during the new hire process that "all information they had access to as employees of FSA was to be treated as confidential." (Doc. 106, PSOF ¶ 4; Doc. 115, DSOF ¶ 4.)  Employees also received an FSA Handbook that had a confidentiality provision. That provision stated the following:

> While many of our competitors are free with disclosing their proprietary information, we have a very strict policy in that regard. No one outside the Company needs to know anything about our Company unless the Chairman or President has identified a specific benefit to the Company. . . . Unauthorized disclosure of information about our company, no matter how harmless it may seem, can be grounds for discipline up to and including termination.

(Doc. 106, PSOF ¶ 6.) Further, as part of their new-hire paperwork, Defendants and other employees signed an Arbitration Agreement. (Doc. 106, PSOF ¶¶ 10–11; Doc. 115, DSOF ¶¶ 10–11.) By signing the Agreement, employees attested to the following:

> I know that I may have access to FSA confidential or proprietary information and that the unauthorized use or disclosure of that information may violate applicable law and my duties to FSA. I agree that it is impossible to measure solely in money damages which FSA may suffer if I violated the law or my duties with regard to FSA's confidential or proprietary information. Therefore, I understand and agree that any action by FSA to protect its rights as to its confidential or proprietary information is excluded from this arbitration agreement, and that if FSA retains the right to seek relief in a court from actual or threatened violation of those rights.

(Doc. 106, PSOF ¶ 12; Doc. 115, DSOF ¶ 12.)

FSA's information was accessible only through its proprietary computer and e-mail system. Manuszak attests that the system "provides access to that data in a customized fashion at a secure facility that restricts access to those who hold passes or electronic passwords." (*Id.*) Keen Chang, FSA's Senior Information Officer, testified that when a new employee joins FSA, "that employee is assigned an ID and password for the company network. That employee will use that ID and password to log on to the network." (Doc. 133-2, Ex. G (Chang Depo.) 32:5–9.) Further, access to the information is "only by permission, with proper authorization on a 'need-to-know' basis." (*Id.*) FSA employees retain access to the extent they need information on suppliers, customers, costs, pricing, and product specifications to perform their functions. (*Id.*) Manuszak states that FSA has invested "tens of millions of dollars in systems and process development over the last 25 years to safeguard" the information and "each year additional investment is made to improve" those systems. (Doc. 106-2, Ex. B (Manuszak Decl.) ¶ 23.)

Besides admonitions upon hire, FSA took steps upon termination to remind employees of their continuing obligations, retrieve information acquired in violation of its policies, and cancel their access. (Doc. 133, PSOF ¶ 4; Doc. 106-2, Ex. B (Manuszak Decl.) ¶ 12.) For example, Manuszak declares and it is undisputed that upon the departure

of a senior director, FSA's general counsel sent a letter "reminding him of his obligations under the confidentiality and nondisclosure agreement." (Doc. 110, DSOF ¶ 37; Doc. 113-1, Ex. Z (Manuszak Depo.) at 65:7–11.) During the director's exit interview, Manuszak "reinforced the confidentiality provisions of the policy and spoke to him about his obligations." (Doc. 113-1, Ex. Z (Manuszak Depo.) at 72:13–20.)

FSA took similar protective measures with Defendants upon termination.  It is undisputed that upon termination, Rubio's access to FSA's system and information "was immediately cancelled, consisted with FSA's general practice with terminated employees." (Doc. 106, PSOF ¶ 15; Doc. 115, DSOF ¶ 15.)  On March 8, 2011, FSA sent a letter to Carrington stating that he had "wrongfully, illegally, and without authority, transferred information electronically to Elba Rubio that is confidential and proprietary property belonging to FSA." (Doc. 106, PSOF ¶ 24.) The letter demanded that the information be returned immediately and reminded Carrington of his obligation to maintain confidentiality. FSA sent a similar letter to Rubio on March 8 demanding that all confidential information be returned to FSA and emphasizing that she was prohibited from using that information. (*Id.* ¶ 25.)

These undisputed facts show that FSA took sufficient measures to safeguard its information even as FSA disclosed it for internal purposes. The relevant authorities support that holding. In *Ehmke*, the Arizona Court of Appeals held that a plaintiff made "reasonable efforts" when it took similar measures. 197 Ariz. at 151. Those measures included "limited disclosure to those employees in need of the information to perform their duties and general directives regarding confidentiality" and "confidentiality provision[s] in its employment agreement[s] . . . as well as in the employee policy handbook that all employees had to acknowledge and sign." *Id*. In *Calisi*, 302 P.3d at 632–32, the Arizona Court of Appeals cited to *Courtesy Temporary Service, Inc. v. Camacho*, 272 Cal. Rptr. 352 (Ct. App. 1990), when discussing the extent to which a company may divulge information while maintaining its secrecy. The *Camacho* court held that a plaintiff made reasonable efforts when it did not divulge information i.e., its

customer lists, to persons outside the business and shared it with employees only as necessary for them to effectively carry out their duties. 272 Cal. Rptr. at 358. The information was accompanied by a reminder to employees that it was confidential and proprietary. The *Calisi* court also cited in approval to *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 522 (Colo. Ct. App. 2011), where, as here, the plaintiff's employees could only access plaintiff's information with a username and password and access was "strictly limited on a 'need to know' basis."

FSA contends that before gaining access to its system, employees also signed Confidentiality Agreements that describe their obligations to maintain secrecy and not to use or disclose, remove or forward FSA information except for FSA business.[3] The

---

[3] The agreement states, in relevant part, the following:

As a condition of the Services Group of America granting you access to its confidential information, the value of which you hereby acknowledge, and in addition to any other confidentiality agreements and obligations that govern your conduct, you have agreed to the following requirements regarding your access to the company's confidential information;

"Confidential Information" means any and all information, whenever accessed or received, related to Company or any affiliate, including but not limited to, information relating to: financial matters, business plans, strategies, customers, marketing, product or service promotions, purchasing, vendors, discounts, rebates, earned marketing income ("EMI"), EMI tracking methods, payroll or employee information (other than payroll or employee information about Associate), business techniques, business tools (including, without limitation, Company's E/I, EIS, payroll and Infinium systems), analysis, contractual terms, costs, margins, ownership structure, financings or other information. Confidential information does not include information that is generally available to the public through no improper action or inaction or breach of Associate.

Confidentiality; Ownership. Associate understands that the Company and its affiliates value highly their Confidential Information, which they have developed at substantial cost and effort, and which are important Company and affiliate assets. Associate agrees that he or she will strictly maintain the confidentiality and proprietary nature of any and all confidential information. Associate agrees not to use or disclose any Confidential Information, directly or indirectly, except in furtherance of the Company's business or as  consented to in writing in each instance by a Company officer, or, upon reasonable prior notice to the Company, as required by law. Associate agrees not to access, read, forward, remove from Company premises, copy or otherwise obtain or retain any Confidential Information except as necessary to perform his or her job with the Company. This agreement applies to confidential information in any form or formats, including without limitation, oral, visual, written, computer records, photographs and tape recordings, and applies to Confidential Information accessed by associate before, as well was after, entering this Agreement. This Agreement shall apply throughout the Associate's employment with Company and after the termination of such employment at

- 14 -

Parties dispute whether Defendants and other employees signed the Agreement at the time Defendants were employed with FSA.[4] That dispute, however, does not create a

any time and for any reason (with or without the cause) by Company or Associate. Associate acknowledges that Company and its affiliates are the sole owners of the Confidential Information. Associate disclaims any right, title or interest in or to the Confidential Information, including without limitation any Confidential Information developed by Associate. Upon termination of employment (for any reason) Associate agrees to return to the company all documents, discs or other items containing Confidential Information.

(Doc. 106, PSOF ¶ 9.)

[4] In support of its contention, FSA submits a confidential agreement with the above-quoted language that is purportedly "e-signed" by Carrington. (*See* Doc 133-1, Ex. A at 3, FSAFED03039) (the signature confirmation reads: "Paul Carrington signed the confidentiality agreement with the initials PLc on 9/8/2008") As to Rubio, FSA submits an acknowledgement form that does not refer to the confidentiality agreement but attests that Rubio will read the Handbook and "understand the policies well enough to carry out [her] job duties . . . ." (*Id.* at 2, FSAFED03121.) FSA also proffers Manuszak's declaration that Carrington e-signed the confidentiality agreement and Rubio also signed the agreement. (Doc. 106-2, Ex. B, Manuszak Decl. ¶¶ 6–7.)

Defendants submit declarations as well as deposition testimony that they do not recall ever seeing or signing the Confidentiality Agreement. (Doc 110-1, Ex. A (Rubio Decl.) ¶ 2; *Id.*, Ex. B (Carrington Decl.) ¶ 2; Doc. 115-1, Ex. C (Carrington Depo.) at 57:16–58:17; *Id.*, Ex. D (Rubio Depo.) at 128:16–25.) FSA points to the fact that Rubio first testified that she had signed the Confidentiality Agreement, that it was part of her new hire packet, and that her actions in acquiring FSA information was in violation of what she signed. (Doc. 133-1, Ex. C (Rubio Depo.) at 64:8–10; 64:14–15; 64:22–65:10.) FSA underscores the fact that Rubio's later testimony that she in fact signed the Arbitration Agreement and not the Confidentiality Agreement was only after a break in the Deposition and in response to defense counsel's questioning. (*See id.* at 122–128.)

FSA also asserts that since 2004 or 2005, it has been company policy to require all employees to e-sign the Confidentiality Agreement before granting access to FSA's database and e-mail system. (Doc. 133, PSOF ¶ 33.) Guy Babbitt, FSA's Chief Information Officer, whose responsibility it is to ensure that employees e-sign the agreement, testified that "[i]t was not possible to access the system and information that [the employee] needed without signing." (Doc. 110-3, Ex. L (Babbitt Depo.) at 29:2–6.) Also, Keen Chang, FSA's Senior Information Officer, testified that when a new employee joins FSA, he or she is assigned an ID and password for the company network, and when the log-in for the first time, the employee must read and initial the confidential agreement before using the system. (Doc. 133-2, Ex. G (Chang Depo.) 31:24–33:5.)

Defendants proffer the statements of two former FSA employees that they were not aware of any policy or practice to e-sign the Confidentiality Agreement. In response to an e-mail from Carrington in March 2011, Ryan Peterson recalled that when he was at FSA he "was not aware of an e-signature being used for [the Confidentiality Agreement]." (Doc. 115-1, Ex. 3 at 1.) Further, Adam Downer, a former SIS, attests that "[a]t no time did I submit an 'e-signature' to a confidentiality agreement, or any other agreement for the company." (Doc. 115-1, Ex. 4 (Downer Decl.) at 3.) Defendants also point to the fact that FSA did not have a practice or policy of archiving employees' e-signatures to the agreements prior to June 2011. (Doc. 110-2, Ex. E (Manuszak Depo.) at

genuine issue of material fact. *See Anderson*, 477 U.S. at 248 (stating that for a dispute to be genuine, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party"). Even assuming that Defendants did not sign the Agreement, FSA has shown that it made reasonable efforts to preserve the secrecy of its information. FSA informed Defendants, at least upon hire and termination, of their obligation not to divulge its information to outside parties or to retain it after termination. Further, FSA had in place significant measures to restrict access to employees that needed to use the information to fulfill their duties.

Defendants also contend that FSA did not take additional measures to protect its information. For example, Defendants assert that FSA could have labeled the information as "trade secret" or "confidential," citing to a California case in support. *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997). The *Morlife* court, however, referred to such labeling in the context of whether the information was readily ascertainable by outside parties. Further, assuming the e-mails submitted by Defendants are copies of the originals, the FSA information had stamps stating "Confidential Trade Secret/Proprietary Information." (*See* Docs. 119-1–6, Ex. O.) Even if the information was not thus stamped, FSA is only required to take "reasonable efforts" to maintain secrecy and not all such efforts. FSA is also not required to track the "assignment history of work computers" as Defendants contend, even if that is a useful measure of security. (*See* Doc. 109 at 21.)

Along with measures that FSA did not take, Defendants find fault with the measures it did. Defendants argue that because Carrington was able to acquire FSA information shortly before termination, and others could hypothetically do the same and disclose it to FSA's competitors, FSA did not make reasonable efforts to maintain the information's secrecy. This argument proves too much. In essence, Defendants argue that so long as anyone is capable of circumventing security measures, a Plaintiff did not undertake sufficiently reasonable precautions.  This argument lacks merit; were it to be

31–35; Doc. 110-3, Ex. L (Babbitt Depo.) at 29–38.)

accepted the tort could not exist. Defendants make another peculiar argument that FSA engaged in "arbitrary enforcement" of its confidentiality policies because when a senior director departed to join a competitor, FSA did no more than remind him of his ongoing obligations. FSA also did not take steps to ensure that the director's fiancé, an FSA senior manager, did not share information with the director after he left FSA. (Doc. 110, DSOF ¶¶ 36, 40.) Both of these arguments are also without merit. Just as FSA is not required to make every conceivable effort to maintain secrecy, it is not obliged to "protect trade secrets against industrial espionage." *Ehmke,* 197 Ariz. at 150. FSA consistently implemented policies to remind employees of their obligations and maintained secure access to its information.

Defendants also argue that because FSA provided access to several employees, the information is not secret. FSA identified 46 different job titles for employees that had similar access to the information as Defendants. (Doc. 110, DSOF ¶ 4.) But the confidential use of information by several employees for a business purpose does not deprive the information of trade secret protection. *See Miller*, 209 Ariz. at 471; Restatement § 757. As discussed above, FSA employees had to use a username and password to access the information and were bound to only use it for FSA business.

The undisputed facts show that FSA's measures to safeguard its compilations of data regarding operators, suppliers, products, and pricing were reasonable. Because FSA's information has independent economic value derived from its non-public nature and FSA took reasonable efforts to maintain secrecy that information consists of protectable trade secrets.

### B. Misappropriation

Under the AUTSA, "misappropriation" consists of either:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:

(i) Used improper means to acquire knowledge of the trade secret.

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

A.R.S. § 44-401(2).

### 1.   Acquisition and Disclosure or Use

Defendants contend that liability only attaches under the AUTSA when a person discloses or uses a trade secret acquired by improper means. The AUTSA is clear on its face; a person who *acquires* a trade secret is liable if acquired through improper means. The AUTSA does not require disclosure or use of the trade secret before attaching liability. In support of their contention, Defendants refers to the following language from the Restatement:

> The prior Restatement of this topic imposed liability only for the wrongful use or disclosure of another's trade secret. Improper acquisition of a trade secret was not independently actionable. See Restatement of Torts § 757 (1939). Wrongful use or disclosure is also frequently recited in the case law as an element of the cause of action for trade secret appropriation. The cases requiring proof of wrongful use or disclosure, however, typically involve information that has been acquired by the defendant through a confidential disclosure from the trade secret owner. In such cases the acquisition of the secret is not improper; only a subsequent use or disclosure in breach of the defendant's duty of confidence is wrongful.

Restatement Third, Unfair Competition § 40 cmt. b (1995). Defendants, however, fail to appreciate additional language in that comment:

> Subsection (a) of this Section follows the rule adopted in § 1(2)(i) of the Uniform Trade Secrets Act, which imposes liability for the *acquisition* of a trade secret by improper means. Thus, a person who obtains a trade secret

through a wiretap or who induces or knowingly accepts a disclosure of the secret in breach of confidence is subject to liability. See § 43, Comment c. Subsequent *use or disclosure* of a trade secret that has been improperly acquired constitutes a *further* appropriation under the rule stated in Subsection (b)(2) of this Section.

*Id.* (emphasis added). Thus, the Restatement accords with the AUTSA in that it imposes liability for both acquisition and use or disclosure of a trade secret. Nevertheless, the AUTSA's language is clear in its imposition of liability for acquisition. When the language of an Arizona statute is "clear and unambiguous, and thus subject to only one reasonable meaning," Arizona courts apply the language without using other means of statutory construction. *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 296 P.3d 42, 46 (2013); *Tang v. Reno*, 77 F.3d 1194, 1196 (9th Cir. 1996) ("If 'the statute is clear and unambiguous, that is the end of the matter.'") (quoting *Sullivan v. Stroop,* 496 U.S. 478, 482 (1990)).

The undisputed facts show that Carrington acquired and disclosed FSA's trade secrets to Rubio who acquired them from Carrington through her e-mail account on March 5 and 6, 2011.

Defendants argue that FSA may not base its misappropriation claim on the disclosure of trade secrets by Carrington to Rubio because the claim was not thus alleged in the Complaint. They contend that in the Complaint, FSA alleged that Defendants engaged in a criminal conspiracy to steal trade secrets for the purpose of disclosing them to competitors. But after alleging that Carrington sent FSA trade secrets to Rubio, FSA alleges that "Defendants willfully and maliciously misappropriated FSA's Trade Secret . . . Information, and have and will continue to violate their confidentiality obligations to FSA, causing continuing degradation in the value of such information." (Doc. 1 ¶ 66.) Further, the Complaint states that "FSA is entitled to recover its actual and consequential damages caused by Defendants' misappropriation of FSA's Trade Secret . . . Information, any unjust enrichment to Defendants and/or others resulting from the misappropriation, and a reasonable royalty for the Defendants' unauthorized disclosure

and use of FSA trade secrets." (*Id.* ¶ 67.) The Complaint does not limit the misappropriation claim to disclosure to FSA's competitors but alleges misappropriation and disclosure in general. The Complaint is consistent with the undisputed facts which show that Defendants acquired and disclosed FSA trade secrets.

### 2.    Knowledge of Improper Means

FSA must further show that Defendants knowingly used improper means to acquire and disclose trade secrets. "'Improper means' include theft, bribery, misrepresentation, breach or inducement of a duty to maintain secrecy or espionage through electronic or other means." A.R.S. § 44-401(1). This list is not exhaustive. The Restatement states that improper means also include fraud, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case. Restatement § 43. It further states that an employee or former employee who uses or discloses a trade secret owned by the employer or former employer in breach of a duty of confidence is subject to liability for appropriation of the trade secret. *Id.* § 42.

Defendants knew that their transmittal of FSA information from its system to their personal e-mail accounts was unauthorized and therefore improper. First, Carrington sent FSA trade secrets to Rubio's personal account despite the fact that they knew Rubio was not authorized to access that information. (Doc. 106, PSOF ¶ 16; Doc. 115, DSOF ¶ 16.) Rubio was terminated on March 4, 2011, and her access was immediately cancelled. (Doc. 106, PSOF ¶ 15; Doc. 115, DSOF ¶ 15.) On that day, Defendants discussed and made plans for Carrington to forward Rubio FSA information from its system over the weekend. (Doc. 106, PSOF ¶ 17; Doc. 115, DSOF ¶ 17.)  Carrington sent trade secrets to Rubio on March 5 and 6 by going to FSA's offices during non-working hours, using an FSA computer and his employee log-in. (Doc. 106, PSOF ¶¶ 18–19; Doc. 115, DSOF ¶¶ 18–19.) Second, Defendants do not argue that they engaged in the acquisition and disclosure of trade secrets for any FSA business purpose.

In doing so, Carrington breached his duties of confidence to FSA and to maintain

secrecy of FSA information. It is undisputed that Carrington signed an Arbitration Agreement that stated that "the unauthorized use or disclosure of [FSA confidential or proprietary] information may violate applicable law and my duties two [sic] FSA." (Doc. 106, PSOF ¶ 12; Doc. 115, DSOF ¶ 12); *see also* (Doc. 106, PSOF ¶¶ 5–6; Doc. 115, DSOF ¶¶ 5–6).

Defendants thus had a duty not to disclose FSA information to any person outside the company and generally, to use the information for the benefit of FSA. At the time Defendants conspired to acquire FSA trade secrets, they both knew that Rubio was "outside the Company" and that their transmittal was an "unauthorized disclosure of information about [FSA]." Rubio testified that acquiring FSA trade secrets in that manner constituted a violation of either her Confidentiality[5] or Arbitration Agreement. (Doc. 106, PSOF ¶ 21; Doc. 115, DSOF ¶ 21.) At the time of transmittal, Carrington knew that providing FSA trade secrets to Rubio violated FSA policy. (Doc. 106, PSOF ¶ 22; Doc. 115, DSOF ¶ 22.) Thus Carrington's disclosure in violation of his duty to maintain secrecy and Rubio's acquisition when she knew she did not have authorization and that Carrington was violating his duty in transmitting trade secrets to her constitutes misappropriation.[6] Summary judgment on the issue of AUTSA liability is granted to FSA.

## C.      Damages

---

[5] As discussed above, the Parties dispute whether Defendants signed a confidentiality agreement upon hire. That dispute, however, is not material because FSA made Defendants aware through the Arbitration Agreement and FSA Handbook of their duty to maintain secrecy.

[6] Defendants argue that FSA has not proven misappropriation because Defendants did not know that the information in fact constituted trade secrets. But that is not an element of the claim. The AUTSA requires simply that persons know they are using improper means to acquire trade secrets or are disclosing trade secrets in breach of their duty to maintain secrecy. A.R.S. § 44-401(2); *see* Restatement (First) of Torts § 757 (1939) ("Liability under the rule stated in this Section is based not on the actor's purpose to discover another's trade secret but on the nature of the conduct by which the discovery is made. . . . [I]f his conduct is improper, he is subject to liability even though he engaged in the conduct for a purpose other than that of discovering the trade secret."). Rubio knew that she acquired the trade secrets using improper means and Carrington knew he was breaching his duty to maintain secrecy by disclosing them to Rubio.

### 1.   Existence of Damages

Under the AUTSA, a plaintiff may seek to recover "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." A.R.S. § 44–403(A). Damages are "an essential element" of a misappropriation claim which fails "without a cognizable theory of proximately caused damages." *W.L. Gore & Associates, Inc. v. GI Dynamics, Inc.*, 872 F. Supp. 2d 883, 888 (D. Ariz. 2012) (citing *Firetrace USA, LLC v. Jesclard,* 800 F. Supp. 2d 1042, 1054 n.5 (D. Ariz. 2010)). A plaintiff bears the burden of proving the fact and cause of any damages for which recovery is sought. Restatement (Third) of Unfair Competition § 45 cmt. b (1995). The plaintiff is required to prove the amount of such loss with only as much certainty as is reasonable under the circumstances. (*Id.*) But damages that are "speculative, remote or uncertain" may not form the basis of a judgment. *W.L. Gore*, 872 F. Supp. 2d at 888 (internal citation omitted).

"The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Robertson v. Sixpence Inns of Am., Inc.,* 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990) (internal citation omitted). Plaintiff need only present probable facts from which the causal relationship reasonably may be inferred. *Id; see also Smith v. Johnson,* 183 Ariz. 38, 899 P.2d 199, 202 (Ct. App. 1995) (a tort plaintiff "must show a reasonable connection between the defendant's act or omission and the plaintiff's injury or damages."). Whether proximate cause exists is usually a question for the jury, unless the facts are undisputed and reasonable people could not differ as to inferences to be drawn from them. *McMurtry v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 293 P.3d 520, 532 (Ct. App. 2013) (internal citation omitted).

Defendants argue that because FSA cannot show they used its trade secrets or disclosed them to others, it cannot show that it was injured by their misappropriation. FSA states that it does not contend there was "actual use or commercial implementation" of its trade secrets. (Doc. 132 at 14.) FSA does assert, however, that it was injured by

Defendants' conduct. Manuszak declares that "[t]en FSA employees spent in excess of 75 employee hours reviewing the documents" that were misappropriated by Defendants. (Doc. 106-2, Ex. B (Manuszak Decl.) ¶ 26.) FSA argues that this expenditure of company resources was directly caused by the misappropriation.

A plaintiff is generally entitled to recover "any proven pecuniary loss attributable to the appropriation of the trade secret" including "the costs of remedial effort." Restatement § 45 cmts. b, e. The Arizona Supreme Court has stated that when the wrongful act of a defendant "makes it necessary to incur expense to protect [the plaintiff's] interest, such costs and expenses, . . . should be treated as the legal consequences of the original wrongful act and may be recovered as damages." *U.S. Fid. & Guar. Co. v. Frohmiller*, 71 Ariz. 377, 380, 227 P.2d 1007, 1009 (1951) (internal quotation marks and citation omitted). Other state courts determining damages under statutes modeled after the UTSA have found "out-of-pocket expenses" sustained as a result of misappropriation to be an element of damages. *See, e.g., Dozor Agency, Inc. v. Rosenberg*, 218 A.2d 583, 585 (Pa. 1966); *Telex Corp. v. Int'l Bus. Machines Corp.*, 510 F.2d 894, 933 (10th Cir. 1975) (noting that expenses incurred in strengthening security measures after misappropriation would be damages in some circumstances).

Even if some of the evidence the Plaintiff offers to demonstrate that it was damaged by Defendant's misappropriation seems, at least at this stage, to exaggerate such damages beyond the point of reason, the Court finds that FSA has provided some evidence that it incurred expenses to investigate Defendants' misappropriation. Such expenses incurred as a direct result of Defendants' conduct are damages for the purpose of proving FSA's claim under the AUTSA. Although Defendants argue that FSA's assertion of remedial efforts is "unsubstantiated," (Doc. 138 at 12), FSA has provided Manuszak's declaration in support of that assertion. At a minimum, the existence of expenses is a genuine dispute of material fact because if FSA's assertion is believed by a factfinder, it would be entitled to damages. Therefore, summary judgment is denied to Defendants.

### 2.    Willful and Malicious Conduct

FSA contends that it is entitled to exemplary damages and attorneys' fees based on the willful and malicious nature of Defendants' misappropriation. Section 44-403(B) states that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under [Section 44–403(A)]." Further, the Court may award reasonable attorneys' fees to the prevailing party for willful and malicious misappropriation. A.R.S. § 44-404(3).

Willful misconduct means "intentional, wrongful conduct, done either with knowledge that serious injury to another probably will result or with a wanton and reckless disregard of the possible results and is essentially a question of fact." *Newman v. Sun Valley Crushing Co.*, 173 Ariz. 456, 460, 844 P.2d 623, 627 (Ct. App. 1992) (internal citation omitted); *Smith v. Chapman*, 115 Ariz. 211, 214, 564 P.2d 900, 903 (1977). Malice is defined as (1) the intent, without justification or excuse, to commit a wrongful act; (2) reckless disregard of the law or of a person's legal rights; or (3) ill will or wickedness of heart. Black's Law Dictionary 1042 (9th ed. 2009); *see Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 502 n.21, 200 P.3d 977, 999 (Ct. App. 2008). Because the requisite conduct is defined by statute, an "evil mind" required for the common law remedy of punitive damages, see *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 331–32, 723 P.2d 675, 680–81 (1986), is not necessary to obtain exemplary damages here.

The undisputed facts show that Defendants conspired for Carrington to transmit to himself and Rubio specific FSA information through its system during non-working hours. (Doc. 106, PSOF ¶ 17; Doc. 115, DSOF ¶ 17.) On the weekend of March 6, 2011, Carrington went to FSA's offices and used an FSA computer to transmit 300 e-mail strings containing trade secrets to his and Rubio's personal e-mail accounts. (Doc. 106, PSOF ¶¶ 18–19; Doc. 115, DSOF ¶¶ 18–19.) At the time, Carrington knew that Rubio was not authorized to have this information. (Doc. 106, PSOF ¶ 22; Doc. 115, DSOF ¶ 22.) It is undisputed that Defendants had signed an Arbitration Agreement stating that

"the unauthorized use or disclosure of [FSA confidential or proprietary] information may violate applicable law and my duties two [sic] FSA." (Doc. 106, PSOF ¶¶ 10–12; Doc. 115, DSOF ¶¶ 10–12.)  They also received an FSA Handbook informing employees that it maintained a "strict policy" of non-disclosure as to proprietary information. (Doc. 106, PSOF ¶ 22; Doc. 115, DSOF ¶ 22.) Thus, Defendants misappropriation was willful.

FSA must also establish the presence of malice through undisputed facts. Defendants argue that they were not aware their misappropriation consisted of illegal conduct. Carrington testified that he did not know that by transmitting the e-mails to himself and Rubio he was breaking the law. (Doc. 115, DSOF ¶ 26.) As discussed, it is undisputed that Defendants executed a plan to procure FSA information surreptitiously and transmit it to Rubio when they knew she was not authorized to have it. Further, FSA made them aware that such misappropriation was in violation of their duties as defined in the various materials they received upon hire.

FSA also points to post-misappropriation conduct to show the presence of malice.[7]

---

[7] Defendants' conduct soon after misappropriation consists of the following. It is undisputed that FSA sent a letter to Carrington the day after he was terminated that week demanding the return of FSA information that had been "wrongfully, illegally, and without authority, transferred . . . electronically to Elba Rubio that is confidential and proprietary property belonging to FSA" and that he was "legally prohibited from making any use of such information." (Doc. 106, PSOF ¶¶ 23–24; Doc. 115, DSOF ¶¶ 23–24.) Carrington responded: "[a]s defined in your letter, I do not have any proprietary and confidential FSA information. To the extent that I had any information pertaining to my employment with FSA, via electronic medium, that information has been permanently deleted and I have no hard copies or work papers in my possession." (Doc. 106, PSOF ¶¶ 23–24.)

At that time, Carrington possessed trade secrets and later testified that he made false representations to FSA. (Doc. 106-1, Ex. A (Carrington Depo.) at 66:6–10.) He testified that he did not know the subject matter within some of the e-mails and "perhaps he could have done a better job of looking through the emails before responding to FSA's March 8 letter." (Doc. 115, DSOF ¶ 27; Doc. 106-1, Ex. A (Carrington Depo.) at 66:14–21.), and did not return the trade secrets when FSA informed him within days that his conduct was illegal. That establishes, at a minimum, that Carrington acted with "reckless disregard of the law or of [FSA's] legal rights." *Sec. Title Agency*, 219 Ariz. at 502 n.21.

1    Although malice "may be inferred or implied from the nature of the acts complained of

2    and the surrounding circumstances," *Barker v. James*, 15 Ariz. App. 83, 87, 486 P.2d

3    195, 199 (1971), those inferences are properly made by a factfinder. There is thus a

4    factual dispute as to whether Defendants acted with malice when misappropriating FSA's

5    trade secrets. Accordingly, FSA motion for summary judgment as to exemplary damages

6    and reasonable attorneys' fees is denied.

7    **III.   SANCTIONS**

8        **A.   Defendants' Motion for Sanctions**

9        Section 44-404 provides that "[t]he court may award reasonable attorney fees to

10   the prevailing party for . . . [a] claim of misappropriation made in bad faith." Rule 11 also

11   provides for sanctions if, among other conduct, a party brings a case for an improper

12   purpose or presents frivolous arguments in support of its claims or defenses. Defendants

13   argue that FSA should be sanctioned for bringing a frivolous lawsuit and continuing to

14   prosecute it for several months although no evidence of Defendants' wrongful use or

15   disclosure to other parties exists. (Doc. 109 at 20–21.) They contend that FSA has not

16   sought discovery from any third party regarding Defendants' wrongful use or disclosure.

17       Because FSA has established its claim for misappropriation under the AUTSA, it

18   cannot be found to have brought the claim based on frivolous arguments. Even if FSA did

19   not pursue discovery from third parties or show that Defendants used or disclosed its

20   trade secrets to others, FSA has established that Defendants acquired and disclosed that

21

22       FSA sent a similar letter to Rubio on March 8. It is undisputed the letter demanded
     that "all confidential proprietary property in her possession, including the massive quality
23   [sic] of information *unlawfully* transmitted by Carrington, be immediately returned,
     emphasizing that she is legally prohibited from making use of any such information."
24   (Doc. 106, PSOF ¶ 25; Doc. 115, DSOF ¶ 25) (emphasis added). When Rubio received
     the letter, she was aware that both she and Carrington possessed information that FSA
25   sought. (Doc. 106, PSOF ¶ 28; Doc. 115, DSOF ¶ 28.)   Despite that knowledge, she
26   neither responded to FSA's letter nor returned FSA's trade secrets. (*Id.*) In fact, as of the
     date of filing of the Complaint on January 25, 2012, neither Defendant had returned any
27   of the trade secrets to FSA. (Doc. 106, PSOF ¶ 29; Doc. 115, DSOF ¶ 29.)
28

information in violation of the AUTSA. Further, Defendants do not show that FSA brought this action for an improper purpose. Therefore, sanctions will not be imposed on FSA.

**B.      FSA's Motion for Sanctions**

**1.      Defendants' Motion to Strike**

**i.      Form and Timeliness of Defendants' Motion**

Defendants move to strike for untimeliness two declarations containing supplemental expert disclosures used in support of FSA's Motion for Sanctions and attached thereto and to its Reply. (*See* Doc. 111-1, Ex. B (Kuchta Decl.); Doc. 122-1, Ex. 1 (Kuchta Decl.).) The declarations are by FSA's forensic expert, Kelly Kuchta. FSA argues, however, that in filing their Motion to Strike, Defendants did not follow the procedure set out in Local Rule 7.2(m) which states: "[a]n objection to (and any argument regarding) the admissibility of evidence offered in support of or opposition to a motion must be presented in the objecting party's responsive or reply memorandum and not in a separate motion to strike or other separate filing."

Although Defendants referred to one of the declarations in its Response to FSA's Motion, (see Doc. 120 at 5, 7), they did not object to the declaration as untimely. Instead, Defendants objected in this separate Motion to Strike on June 17, 2013, nearly one month after their Response on May 20. (Docs. 120, 134.) Defendants were not able to object in their Response to the second offending declaration since it was attached to FSA's Reply. The Court stated in its Case Management Order ("CMO") that it "intends to enforce the deadlines set forth in this Order." (Doc. 30 ¶ 10.) Therefore, although Defendants did not comply with the Local Rules in objecting to one of the declarations, the Court will consider the merits of the untimeliness objections.

**ii.      Timeliness of FSA's Expert Disclosures**

Rule 26(a)(2)(D) demands that disclosures are timely made based on "the times and in the sequence that the court orders." The CMO states that "[t]he party with the burden of proof shall provide full and complete expert disclosures as required by Rule

26(a)(2)(A)-(C) of the Federal Rules of Civil Procedure no later than September 28, 2012." (Doc. 59 ¶ 5(c)). It further states that "[r]ebuttal expert disclosures, if any, shall be made no later than October 26, 2012" and that "[e]xpert depositions shall be completed no later than March 1, 2013." (*Id. ¶¶* 5(d)–(e).) FSA filed the declarations containing supplemental expert disclosures with its Motion and Reply on May 3 and May 30, 2013. (Doc. 111-1, Ex. B (Kuchta Decl.); Doc. 122-1, Ex. 1 (Kuchta Decl.).)

FSA at no time requested the Court to extend the deadlines for expert disclosures set out in the CMO. Therefore, a modification of the schedule pursuant to Rule 16(b)(4) is not applicable here. Although FSA argues that "there is good cause for allowing the expert testimony in issue" under Rule 16(b)(4), it has not requested the Court to modify the schedule. To the extent that FSA implicitly requests the Court to modify the schedule so that its supplemental disclosures are considered timely, that request comes too late. It is not until Defendants moved to strike the disclosures that FSA made such a request to modify in its Reply to Defendants' Motion. Thus, the supplemental disclosures are untimely.

### iii.   Sanctions

Rule 37(c)(1) describes the consequences for failing to provide timely expert disclosures as required by Rule 26. Rule 37(c)(1) states: "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." This discovery sanction is described as a "self-executing, automatic sanction to provide a strong inducement for disclosure of material." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001) (citing the Advisory Committee's Notes to Rule 37(c)(1) (1993)) (internal quotation marks and alterations omitted). FSA may still introduce the expert disclosures if it can prove that its failure to disclose was substantially justified or harmless. *Id.* at 1106–07. Unless FSA can show that one of these exceptions applies, it will be sanctioned for its untimely disclosures and precluded from using them in support of its Motion for Sanctions. *See Yeti*, 259 F.3d at 1107. ("It is the obligation of the party

facing sanctions for belated disclosure to show that its failure to comply with Rule 26 was either justified or harmless . . . .") (internal citation omitted).

### a.    Substantial Justification

FSA contends its delay in disclosing is "tied to [Defendants'] own litigation misconduct: Defendants, yet again, lied about the information they possess and its availability. It simply took FSA's expert time to sort through Defendants' lies." (Doc. 136 at 7.)  But FSA does not explain what Defendants' conduct caused FSA to delay their disclosures more than seven months after expert disclosures were due in September 2012 and two months after expert discovery completed in March 2013. The declarations and the substance of FSA's Motion which they support are based on facts that were in FSA's possession even before the expert disclosure deadline in September. The crux of the Motion is that Defendants have not produced a hard drive that Carrington used with his computer and that he erased data from his computer before producing it in May 2012. Indeed, the latest factual date in the Motion is June 20, 2012, when Defendants' counsel informed FSA as to the unavailability of the hard drive.

The expert disclosures contained in the declarations are also not based on previously unavailable facts. In the first declaration, Kuchta opines on the hard drive and whether Carrington erased data. (*See* Doc. 111-1, Ex. B (Kuchta Decl.) ¶¶ 3–5.) That opinion is based on further review of the forensic image of Carrington's computer on which Kuchta based his earlier report filed on September 28, 2012, (Doc. 46). The declaration also refers to Defendants' rebuttal expert report which was filed on November 26, 2012, (Doc. 65). Kuchta's second declaration rebuts contentions made in Defendants' Response to FSA's Motion for Sanctions. It provides additional expert opinion based on the same facts available to Kuchta prior to his September expert report. (*See, e.g.,* Doc. 122-1, Ex. 1 (Kuchta Decl.) ¶¶ 5–6, 9–10.) Therefore, FSA's untimely disclosures contained in the declarations are not substantially justified.

### b.    Harmlessness

FSA's untimely disclosures were not harmless. The first declaration provides

previously undisclosed opinion based on further review of the forensic image. (Doc. 111-1, Ex. B (Kuchta Decl.) ¶¶ 3–4.) Kuchta had mentioned in his original report that the computer had been purchased with a hard drive different than the one it currently had. (Doc. 111-1, Ex. A (Exp. Rep.) ¶ 4(A).) But he opined in the supplemental declaration that the original hard drive was one of the multiple devices connected to the computer hours before Defendants produced it to FSA. (Doc. 111-1, Ex. B (Kuchta Decl.) ¶ 4.) Kuchta had stated in the original report that there was evidence that cleaning software had been used to erase data from Carrington's computer and that it was installed and uninstalled on May 12, 2012. (Doc. 111-1, Ex. A (Kuchta Exp. Rep.) ¶ 5(A)(3), 6(A)(2).) Kuchta opines in the declaration for the first time, however, that Carrington used the cleaning software on May 12. (Doc. 111-1, Ex. B (Kuchta Decl.) ¶ 5.)

In the second declaration, Kuchta rebuts assertions in Defendants' expert report and Response to FSA's Motion. Based on additional technical information, he opines as to the plausibility that several USB devices were connected to the computer shortly before production and that cleaning software was used. (Doc. 122-1, Ex. 1 (Kuchta Decl.) ¶¶ 5–7, 9–10.)

In the briefing for its Motion for Sanctions, FSA cites to Kuchta's supplemental opinion about the original hard drive and the date on which Carrington used cleaning software. (Doc. 111 at 3; Doc. 122 at 2–4, 6–7.) Defendants, however, did not have an opportunity to rebut Kuchta's supplemental opinion or depose him about it because it was disclosed after the discovery deadline. Therefore, the declarations are stricken to the extent they contain new expert disclosures because their untimeliness is neither substantially justified nor harmless to Defendants.

## 2. Merits of FSA's Motion for Sanctions

### i. Spoliation of the Fujitsu Drive

"A district court can sanction a party who has despoiled evidence [under] the inherent power of federal courts to levy sanctions in response to abusive litigation practices . . . ." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). The court may

make factual findings in relation to a Motion for Sanctions based on the spoliation of evidence. *Id.*; *see Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 885 (9th Cir. 1991).

"A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Id.* at 959 (internal citation omitted) (emphasis in original). "A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence." *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (internal citations omitted).

FSA contends that Defendants have either destroyed or withheld a hard drive that was connected to Carrington's computer[8] before it was produced to FSA. Kuchta opined that based on a forensic image of the computer, a Fujitsu brand hard drive (the "Fujitsu drive") was used in conjunction with the computer. (Doc. 111-1, Ex. A (Kuchta Exp. Rep.) ¶ 5(A)(2).) Defendants have acknowledged that the Fujitsu drive was the original hard drive installed on the computer. (Doc. 120 at 8.) FSA inquired with Defendants' counsel on June 20, 2012, about storage devices connected to Carrington's computer, (see Doc. 111-1, Exs. C, D), and requested copies of hard drives used in conjunction with the computer on November 6, (see Doc. 111-1, Ex. E (Pl.'s Req. for Prod.) at 8). In response to the first inquiry, Defendants' counsel informed FSA that the Fujitsu drive "crashed sometime around April 2011, and was promptly replaced. [Carrington] said he may still have the crashed hard-drive, and I have asked him to try and locate it." (Doc. 111-1, Ex. D.) Defendants have not yet produced the drive.

---

[8] The computer is identified in Kuchta's expert report as a Lenovo IdeaPad U450p with serial number CBU0338478. (Doc. 111-1, Ex. A (Kuchta Exp. Rep.) ¶ 4.)

### a.   Duty to Preserve

The duty to preserve "arises when a party knows or should know that certain evidence is relevant to pending or future litigation." *Surowiec*, 790 F. Supp. 2d at 1005 (D. Ariz. 2011) (internal citations omitted). The existence of a duty to preserve is determined with reference to the point in time when evidence was destroyed or altered. *See id*. FSA contends that the Fujitsu drive was last used on the day the computer was produced to FSA. In his expert report, Kuchta lists the Fujitsu drive as having a "last written" date and time of May 29, 2012 and 4:17 a.m. and concludes that it was then attached to the computer. (Doc. 111-1, Ex. A (Kuchta Exp. Rep.) ¶ 5(A)(2).)

Defendants' expert, Tim Greer, opined that Kuchta's conclusion that seven storage devices including the Fujitsu drive were connected to Carrington's computer at the same time on the day it was produced is "highly suspicious, and likely wrong." (Doc. 66-1, Ex. A (Greer Exp. Rep.) at 3.) In fact, Greer's analysis of the data registry showed as many as sixteen devices connected at once and he did not find any "human-caused file activity" in the hours before or after that time. (*Id.* at 3–4.) He concluded that "[t]he date/stamp must be the result of a system function, a power issue or some sort of standby/sleep anomaly." (*Id.* at 3.)

Defendants instead assert that Carrington last used the Fujitsu drive in April 2011 when it crashed and was replaced by a new hard drive. (Doc. 20 at 7–8; Doc. 111-1, Ex. D.) In support, Defendants proffer declarations from Carrington's parents recounting conversations around that time and an e-mail exchange from April 2011 in which Carrington and his father discuss the computer issues.[9] (Doc. 120-1, Exs. 2 (April 2011 e-mail exch.); C (William Carrington Depo.) ¶ 11, D (Paula Carrington Depo.) ¶ 4.) Nevertheless, based on his analysis of the forensic image, Greer found that that the

---

[9] Defendants argue that those declarations and e-mails are hearsay under Rule 802. They contain Carrington's out-of-court statements offered for the truth of the matter asserted, namely, that the Fujitsu drive crashed in April 2011. But the Court may consider this evidence because it shows facts to which Carrington and/or his parents may testify at trial.

Fujitsu drive was "connected at some point" to the computer after the drive was replaced. (Doc. 66-1, Ex. A (Greer Exp. Rep.) at 3.)

FSA contends that the attached e-mails and the conversations between Carrington and his mother therein, prove that Carrington was contemplating litigation against FSA as early as March 30, 2011. (See Doc. 120-1, Ex. 1 (March 2011 e-mail exch.).)  But FSA does not show why the Fujitsu drive would have been relevant to that litigation, presumably involving employment claims.

In light of this evidence, the Court finds that Carrington replaced the Fujitsu hard drive with a new hard drive in April 2011. Although there is evidence that he used the drive between April 2011 and May 2012, the facts do not show when. Nor was this lawsuit filed until January 2012.  The filing of the lawsuit would give sufficient notice to the Defendants of their obligation to preserve the hard drive. But, FSA's Motion requires it to establish that Defendants destroyed the Fujitsu drive after they knew that they had an obligation to preserve it. This FSA has not done; therefore its Motion for Sanctions for the destruction of this hard drive is denied.

## ii.    Spoliation of the Western Drive

When the Fujitsu drive crashed in April 2011, Carrington replaced it with a Western Digital brand hard drive (the "Western drive").[10] (Doc. 111 at 5.) FSA contends that the Western drive produced along with Carrington's computer on May 29, 2012, had been materially altered by Carrington. Kuchta's forensic analysis shows that software called "CCleaner" was used to erase data on the Western drive on May 12; just a few weeks before production. (Doc. 111-1, Ex. A (Kuchta Exp. Rep.) ¶ 6(A).) Defendants admit that Carrington installed and used CCleaner on May 12, but on no date after that. (Doc. 120 at 5.)

/ / /

---

[10] The Western drive is identified as a 320 GB Western Digital hard drive, Model WD3200BPVT-00HX2T1, with serial number WX21A11A5091. (Doc. 111-1, Ex. A (Kuchta Exp. Rep.) ¶ 4.)

### a. Duty to Preserve

FSA brought this suit in January 2012. Therefore when Carrington erased data on the Western drive on May 12, 2012, he had a duty to preserve that and other evidence associated with his computer. Further, Defendants' counsel "initiated dialogue with [FSA] regarding forensic analysis of Defendant Carrington's personal laptop" as early as March 9, 2012. (Doc. 45 at 3–4.) Carrington knew or should have known at least in March 2012 that he should preserve information on his computer and the Western drive.

### b. Culpability

When a party on notice intentionally destroys, rather than accidentally loses, that evidence, it is a "willful" spoliator even if it did not intend to deprive an opposing party of relevant evidence. *Leon,* 464 F.3d at 959 (destruction was willful when a party "knew he was under a duty to preserve [evidence], but intentionally deleted many files and then wrote a program to write over the deleted documents"). Carrington willfully erased data from the Western drive weeks before he produced it to FSA. He knew or should have known at the time that the drive constituted relevant evidence and that he had an obligation to preserve it.

Carrington does not declare why he did not preserve data on the Western drive. Defendants in their Response to FSA's Motion provide the closest statement to an explanation when they ask rhetorically "how much longer than four months after filing of the lawsuit should Defendants have avoided using and maintaining the functionality of the only personal computer available to them?" (Doc. 120 at 12.) They imply that Carrington erased data to improve the performance of his computer.  Although the Court can appreciate the practical difficulties with preserving evidence on one's personal computer, the duty to preserve in the midst of litigation is paramount. Carrington willfully breached that duty.

### c. Relevance

The Western drive was the primary hard drive on Carrington's personal computer at least from April 2011 to May 2012 when it was produced to FSA. Since Carrington

still possessed FSA trade secrets on the computer during that time period, data on the Western drive was potentially relevant to FSA's claims. It is not ascertainable what files the CCleaner erased from the drive. But "because the relevance of destroyed documents cannot be clearly ascertained because the documents no longer exist," Defendants "can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon*, 464 F.3d at 959 (internal quotation marks and citation omitted). There are facts sufficient to show likelihood that some of the files erased from the Western drive were relevant to FSA's claims.

### d.   Sanctions

District courts may impose sanctions as part of their inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, *reh'g denied*, 501 U.S. 1269 (1991). "Sanctions that a federal court may impose for spoliation include assessing attorney's fees and costs, giving the jury an adverse inference instruction, precluding evidence, or imposing the harsh, case-dispositive sanctions of dismissal or judgment." *Surowiec*, 790 F. Supp. 2d at 1008. While using discretion to impose sanctions, if any, "courts generally consider three factors: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) (internal quotation marks and citations omitted).

FSA asks for the following sanctions against Defendants: (1) strike the Defendants' Answer; (2) proscribe Defendants from offering testimony, evidence or argument based on matters likely to have been contained within the Western drive, including argument that Defendants took FSA's trade secrets for a lawful reason and that they have not and/or do not intend to use the information for profit; (3) an adverse inference instruction to the jury that because Defendants spoliated the Western drive, if the data on the drive were available, it would show that Defendants intended to and/or did

exploit FSA's information for profit and that such actions were willful and malicious; and (4) award attorneys' fees and costs incurred as a result of Defendants' spoliation. (Doc. 111 at 8–9.)

An adverse inference instruction is appropriate. "[A] finding of 'bad faith' is not a prerequisite" to an imposition of an adverse inference. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). But Defendant's proposed instruction overreaches; it asks the jury to find that the erased data would show Defendants intended to willfully and maliciously profit from their misappropriation. While a court may take the degree of culpability into account when fashioning an adverse inference, it nevertheless must "impose the 'least onerous sanction' given the extent of the offending party's fault and the prejudice to the opposing party." *Napster,* 462 F. Supp. 2d at 1078 (quoting *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir. 1994)).

Although FSA has shown that the erased data was likely relevant to its claims, they understandably have not been able to prove the contents of that data. Therefore, a more neutral instruction is appropriate. The Court will instruct the jury as follows:

> Defendants have failed to prevent the destruction of relevant evidence for Plaintiff's use in this litigation. This failure resulted from their failure to perform their discovery obligations.
>
> You  may, if you find it appropriate, presume from that destruction that  the evidence that was destroyed was relevant to Plaintiff's case, and that the destroyed evidence was favorable to Plaintiff.
>
> Whether this finding is important to you in reaching a verdict in this case is for you to decide.

Further, the Court awards $500 to FSA for attorneys' fees and costs related to its Motion for Sanctions.

## CONCLUSION

The undisputed facts show that Defendants misappropriated FSA's trade secrets. The existence of damages, however, is disputed; there is evidence that FSA incurred expenses from its investigation of Defendants' misconduct. Further, the existence of

malice is disputed. Therefore, an award of exemplary damages and attorneys' fees are inappropriate at this stage of the litigation.

FSA's expert disclosures contained in declarations attached to its Motion for Sanctions were untimely. Because the delay was not substantially justified or harmless, the declarations are stricken to the extent they contain new expert disclosures. As to the merits of FSA's Motion, Defendants did not have a duty to preserve the Fujitsu drive in April 2011. Defendants did have a duty to preserve the Western drive in May 2012, willfully spoliated the drive by erasing data on it, and the data may be relevant to FSA's claims. Therefore, the Court will sanction Defendants by providing an adverse instruction to the jury as described above and awarding attorneys' fees to FSA in relation to its Motion for Sanctions.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment, (Doc. 105), is **granted in part and denied in part.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Cause of Action Under the Arizona Uniform Trade Secrets Act, (Doc. 109), is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sanctions Due to Defendants' Spoliation of Material Evidence, (Doc. 111), is **granted in part and denied in part** as follows:

(1)    The Court will provide an adverse inference instruction to the jury as described in this Order.

(2)    The Court awards $500 for attorneys' fees and costs incurred by Plaintiff in bringing its Motion for Sanctions, (Doc. 111).

/ / /

/ / /

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike and Preclude Plaintiff's Untimely Expert Disclosures, (Doc. 134), is **granted in part and denied in part**. The declarations, (Doc. 111-1, Ex. B (Kuchta Decl.); Doc. 122-1, Ex. 1 (Kuchta Decl.)), are stricken only to the extent that they contain new expert disclosures and not in their entirety.

Dated this 23rd day of August, 2013.

_____
G. Murray Snow
United States District Judge